UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| V. | ) | No. 2:12-CR-25 |
| | ) | |
| ISIDORO GARCIA, *ET AL.* | ) | |

# REPORT AND RECOMMENDATION

The defendant Mateo Hernandez has filed a motion to suppress evidence and statements. (Doc. 117). This motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on January 10, 2013.

In February 2012, various officers assigned to the DEA Drug Task Force were conducting an investigation into cocaine distribution activities in Hamblen and surrounding counties. That investigation centered upon Cesar Tomas-Zalpa, a co-defendant of Mateo Silva Hernandez, the defendant herein. The officers utilized a confidential informant ["CI"], who contacted Zalpa by recorded telephone calls. Zalpa instructed the CI where the cocaine would be exchanged for payment.

Officers conducted surveillance of Zalpa's residence at 411 Hayter Drive in Morristown, Tennessee. After the CI ordered the cocaine, the officers followed Zalpa to one

of several "stash houses" where he would pick up the drugs for delivery to the CI.[1] They then followed Zalpa to the place where the exchange took place, and then followed him back to his residence.

During earlier arrests in connection with this investigation, loaded weapons were found in the possession of various defendants in this case.

On February 11, 2012, the CI made a recorded call to Zalpa to purchase a quantity of cocaine. Officers observed Zalpa drive from his residence to the home of co-defendant Abel Tomas Silva. Zalpa entered Silva's residence. He came out a short time later and proceeded to drive to the residence of the CI, where he delivered cocaine in exchange for payment. Zalpa then returned to Silva's residence.

Based upon these observations, the officers obtained a search warrant for Silva's residence. Silva was arrested and subsequently gave a statement.

The CI called Zalpa on March 8, 2012, and arranged for another cocaine purchase. Zalpa said that half the money would have to be paid up front. The CI met with Zalpa; that meeting was observed by agents, who watched as the confidential informant gave Zalpa the front money. Zalpa then proceeded directly to the residence of defendant Hernandez at 1936 Rankin Road in Dandridge, Tennessee. The surveilling officers saw a maroon Ford Mustang parked at that address, as well as Zalpa's vehicle. While Zalpa was in Hernandez' residence, he made several phone calls to the CI regarding the cocaine transaction, all of which were

---

[1] One of those stash houses was the defendant Hernandez's residence, as will be shown hereafter.

2

monitored by the agents. Zalpa finally told the CI that because he was concerned about police in the area, and because his girlfriend was threatening to turn him in to the police if he completed the transaction, he was cancelling the transaction for that day.

Detective Michael Hurt of the Morristown Police Department conducted surveillance of Zalpa's residence the next day, March 9, 2012. The CI, again in a recorded call, contacted Zalpa and ordered four ounces of cocaine. Detective Hurt followed Zalpa, who drove directly from his house to defendant Hernandez' residence. In the meantime, Zalpa called the CI and said that his cousin, the co-defendant Miguel Tomas, would be delivering the cocaine. Zalpa advised that Tomas would be driving a silver Monte Carlo. The Monte Carlo left Hernandez's residence and was followed by Detective Hurt, who decided to conduct a traffic stop.[2] He took Tomas out of the vehicle and gave him Miranda warnings. Other officers, including DTF Agent Kevin Kimbrough who was in charge of the investigation, arrived on the scene. No cocaine was found in the vehicle, but Agent Kimbrough found the four ounces of cocaine about 100 yards away alongside the highway, where Tomas had thrown it from his vehicle. The cocaine was in hard chunks, indicating to Agent Kimbrough that it had been broken off of a kilogram "brick" of cocaine.

Under questioning by the agents, Miguel Tomas admitted to delivering drugs for Zalpa. He said that he had been given the cocaine by a "large, dark complexioned" Hispanic

---

[2] Hurt testified that he did not recall if he had probable cause to believe that Tomas committed a traffic violation. But he also testified that he had reasonable suspicion that Tomas was transporting cocaine, and that a *Terry*-stop was justified. This court agrees.

3

male.  *He told them that there was a brick of cocaine at Hernandez' residence at 1836 Rankin Road, which he had seen on a table in the living room.*  He also told them that if it was discovered that law enforcement was closing in on Zalpa's operation, that cocaine would immediately be moved to another, and unknown, location.

Given that such a significant amount of cocaine was in imminent danger of disappearing, Hurt, Kimbrough and the other agents decided to go to 1836 Rankin Road to conduct a "knock and talk" in an effort to obtain permission to search for the cocaine.  When they arrived at the Rankin Road address, both Zalpa's vehicle and the maroon Mustang were gone.  Hurt went to the front door and knocked.  No one answered.  He then backed his vehicle off the road to observe and wait.  While waiting, Detective Hurt typed up and printed an application for a search warrant.  An agent made contact with a local state judge who agreed to meet with Hurt and consider the application for the warrant.  Detective Hurt contacted Agent Kimbrough and asked him to maintain surveillance on the Rankin Road residence while he went to meet with the judge.  Agent Kimbrough then took up position at 1836 Rankin Road.

Moments later, Agent Kimbrough was contacted by Detective Hurt and told that he had just met the maroon Mustang about one tenth of a mile away, that it was coming towards the residence, and it was being driven by a large, dark-complexioned Hispanic male.[3]  The Mustang pulled into the driveway of 1836 Rankin Road and stopped.  Kimbrough got out of

---

[3] The defendant is a relatively large man, and he indeed has a very dark complexion.

4

his vehicle and approached the Mustang. Not knowing how defendant would react, Kimbrough removed his sidearm from its holster for his own safety, but he held it behind his leg and pointed to the ground. Hurt and other agents arrived back on the scene at this time. After observing that defendant Hernandez was calm, Agent Kimbrough holstered his weapon. However, he noticed that defendant had a "Santa Muerte" pendant around his neck, which he knew was worn by members of drug distribution gangs in Mexico. As a result, Agent Kimbrough remained cautious about the safety of himself and the other officers.[4] He patted the defendant down for weapons and found none. Both Hurt and Kimbrough stressed that at no time did any agent point a firearm at defendant.

Agent Kimbrough told the defendant that the officers had reason to believe that there was a large amount of cocaine in the house. When asked if in fact there was cocaine in the house, the defendant replied that there was not. Detective Hurt then asked the defendant if they could search the residence, and defendant agreed. It was stressed to the defendant that he was not under arrest and that his consent must be voluntary for them to lawfully search the trailer. A form entitled "Waiver of Constitutional Rights to a Search Warrant" was prepared. Detective Hurt said the defendant read the form, initialed it, and signed it. Both Hurt and Kimbrough testified that defendant never revoked the consent.

The agents then accompanied the defendant to the door of the trailer which defendant

---

[4]"Santa Muerte" is the "Saint of Death," and is a favored talisman of drug traffickers. This court has had other cases involving this "saint;" fairly or unfairly, Santa Muerte has been adopted by members of Mexican drug cartels.

unlocked. The officers asked the defendant if there were weapons in the trailer; he said there was a .357 revolver in the back bedroom, which one of the officers retrieved.

The agents and defendant sat at a bar area in the kitchen. Hurt told the defendant once again that they had reason to believe a large quantity of cocaine was in the house. The defendant then pointed to a kitchen drawer, which was found to contain two ounces of cocaine. Hurt told the defendant that he knew there was more cocaine than that in the trailer, and he asked defendant where it was. Defendant led them to the living room and said the cocaine was under the sofa. Beneath the sofa back was a half-kilo of cocaine packaged as Miguel Tomas had described. The sofa was adjacent to the table on which Miguel Tomas said he saw the large brick of cocaine.

At this point, Agent Kimbrough read defendant his Miranda rights and asked him if he understood them. Defendant said that he did. Both Hurt and Kimbrough testified that they had no difficulty understanding defendant, and that he had no problem in understanding what they were asking him. Officer Kimbrough testified that there was a high school diploma for the defendant from a high school in the United States. He then signed a waiver form in their presence. The conversation was casual and non-confrontational. Defendant was never handcuffed while this discussion was taking place. Defendant gave the officers a statement which Kimbrough reduced to writing, which both the defendant and Agent Kimbrough signed. Defendant was interested in cooperating with the agents in their investigation. At Kimbrough's request, he placed a recorded call to Zalpa to see if he could

6

get him to come back to their location.[5]

At the suppression hearing, through an interpreter defendant testified that he spoke very little English, and did not understand either document he signed at the behest of Detective Hurt. Defendant is now thirty-eight years of age, and he has lived in the United States since he was fifteen. In other words, he has lived in the United States for twenty-three years. It is impossible to believe that he has led such a secluded and isolated existence during those twenty-three years that he has gained no more ability to speak the English language than he professed at the hearing. Moreover, he acknowledged that the facts stated in his statement to Agent Kimbrough were true. That statement is long and detailed, and the only way Kimbrough could have learned those facts and written them down was because defendant told him, which in turn indicates that defendant well understood all of Kimbrough's and Hurt's questions. His current purported lack of ability to speak or understand English is a matter of current expediency, and is feigned. Both Hurt and Kimbrough testified that defendant spoke very good English, and they were able to communicate well with defendant. They are believed. Defendant's testimony that he spoke little English, and did not understand the officers, is not believed. Defendant knew that he was being asked to consent to a search of his residence, and he knew that he had the right to refuse. He also knowingly and voluntarily waived his right to remain silent.

---

[5]Zalpa was the initial target of the investigation. Obviously, the agents' effort to get Zalpa to return to Hernandez's trailer was unsuccessful. Zalpa has never been arrested, and he has been severed from this case, *see*, Doc. 87.

Detective Hurt and Agent Kimbrough had more than a reasonable suspicion, based on articulable facts, that cocaine was located in defendant Hernandez's house, and that Hernandez was involved in Zalpa's cocaine trafficking. That reasonable suspicion entitled Hurt and Kimbrough to briefly confront defendant and to question him. *See, Terry v. Ohio*, 392 U.S. 1 (1968), and *United States v. Sokolow*, 490 U.S. 1 (1989). The only overt show of force was Kimbrough's precautionary unholstering of his weapon and holding it behind his leg when he first met the defendant. All in all, the encounter between the officers and defendant was rather cordial.

Defendant understood his constitutional right to remain silent, and he likewise understood his right to refuse consent to search his house. He voluntarily and knowingly relinquished his right to remain silent, and he knowingly and voluntarily consented to a search of the house.

It is recommended that defendant's motion to suppress evidence and statements, (Doc. 117), be denied.[6]

Respectfully submitted,

                s/ Dennis H. Inman
                United States Magistrate Judge

---

[6]Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).